Nelson v. Wick, No. S0322-02 Cncv (Katz, J., Mar. 3, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

NELSON

v.

WICK

ENTRY

Plaintiff seeks a ruling on the measure of damages following a partial summary judgment on liability. Defendant disputes plaintiff's method to calculate damages and the point from which pre-judgment interest should run. Plaintiff also seeks compensation for a lost opportunity to purchase a house in Massachusetts and for damage to his credit record. Defendant argues that these are speculative damages and improper for a legal malpractice award.

In 1999, plaintiff's purchase and sale agreement with buyers for his home fell through because the house lacked a certificate of occupancy from the town in accordance with 24 V.S.A. § 4443. Defendant, plaintiff's title attorney, had originally conducted the title search in 1988 when plaintiff purchased the house and did not report this missing permit. As a result, defendant is liable for the damages resulting from plaintiff's inability to sell because of a title defect. Estate of Fleming v. Nicholson, 168 Vt. 495, 499 (1998). As a malpractice action, the measure of damages comes from the negligence of the attorney. In other words, after proving the attorney was negligent, plaintiff must prove by a preponderance of the evidence that the negligence proximately caused the injury claimed. Fleming, 168 Vt. at 497; Callan v. Hackett, 170 Vt. 609 (2000) (mem.).

Plaintiff originally purchased his home in 1988 for $175,000. Plaintiff then lived in his home for the next ten years using it for collateral on three loans and generally enjoying the benefits of home ownership. The 1999 Purchase and Sale agreement that plaintiff signed was for $179,000. After the missing certificate ended this deal, plaintiff remained in possession of the house. With the additional loans, plaintiff still carried $163,186.08 in debt. Based on its ascertained value, plaintiff's mortgage company offered to forgive $134,613.59 of the mortgage price in exchange for the title. Plaintiff agreed and the remaining debt was turned into an unsecured $20,000 promissory note and cash payments of $8,572.49 made to the mortgagee. Plaintiff now claims, through the proposed expert testimony of appraiser Roger Fay, that the property was only worth $43,000 at the time of defendant's title search in 1988.

The purpose of damages in a malpractice suit is to put the plaintiff in the same position as he would "have occupied had no wrong been committed." Kramer v. Chabot, 152 Vt. 53, 55 (1989). In this case,

plaintiff asserts that the only way to value his losses is through an out-of-pocket theory, which would establish damages by taking the price paid in 1988 ($175,000) and subtracting the value of the home in 1988 as established by plaintiff's appraiser ($43,000) to arrive at the measure of damages ($132,000). See Westine v. Whitcomb, 150 Vt. 9, 15 (1988) (applying the out-of-pocket rule). The problem with this approach is that it ignores the flexible nature of damage valuation that has been adopted in Vermont. Kramer, 152 Vt. at 56–57 ("[The Vermont] approach leaves to the trial court's discretion the determination of the best measure of damages to make the injured party whole again."); see also 4 R.Mallen & J. Smith, Legal Malpractice § 31.10, at 706 (5th ed. 2000) ("The measure of damages usually depends on the nature of the client's interest in the property.").

There are several compelling factual wrinkles in the present case that make the strict application of the out-of-pocket valuation rule inappropriate in the present context. Defendant in the present case is liable to plaintiff based on changes in liability for title attorneys over the past ten years. See generally J.Farkas, Feature: Real Property Law—Bianchi II/S.144, 25 Vt. Bar J. & L. Dig. 57 (1999) (detailing the liability roller coaster launched by Bianchi v. Lorenz, 166 Vt. 555 (1997)). While plaintiff would like to equate his situation with the plaintiffs in Fleming, where the out-of-pocket rule was applied, the cloud on title involved here is quite different. In Fleming, the defendant attorney found that the property lacked a critical subdivision permit but did not inform his client because the administrative agency had a non-enforcement policy. Fleming, 168 Vt. at 496. Following the closing, Fleming occupied the house. In the meantime, the agency in charge of permit enforcement reversed its policy and began enforcing the permit requirement. Id. A few years later, Fleming's estate, because of the change, was unable to sell it for more than 15% of the original price. Id.

In the present case, there is no proof that defendant attorney was aware of the missing certificate of occupancy when he performed the title search in 1988. Prior to Bianchi, title attorneys simply did not investigate municipal permits because they did not affect marketable title. Farkas, supra, at 57. While this does not affect defendant's liability, it does alter the fairness of making a valuation at the time of the transaction. It is reasonable in looking at plaintiff's damages to consider that he could have sold the house at anytime prior to Bianchi with no loss. Indeed, plaintiff effectively did sell this home three times before Bianchi when he refinanced, taking out equity. Were we to adopt, as a measure of damages, the difference in value at time of attorney error, we would then be in the anomalous position of applying a Bianchi valuation, nine years before anyone knew that was the standard, and therefore, before it actually did effect market value.

Moreover, plaintiff here, unlike the owners in Fleming, has not suffered the same kind of total loss of value. When plaintiff sought to sell his home in 1999, he had an agreement that would have netted him $5,500 in profit. Instead, because of defendant's breach, he was unable to obtain that price and had to settle for debt forgiveness of $134,613.59. In other words, plaintiff was unable to profit but he still redeemed 78% of the original value of the house. A far cry from the 15% recovered in Fleming. See 4 Mallon & Smith, supra, at § 31.10 ("If the encumbrance results in a complete loss of the property, the vendee of the property can recover its value . . ."). To then award plaintiff a damage valuation of $132,000 based on an estimate of its 1988 "Bianchi" value would give plaintiff $266,613.59 for a house that he was quite willing to sell for $179,000. Such an award would clearly enrich the plaintiff and would not satisfy the principle of compensation, which seeks only to put plaintiff in the position he would have enjoyed had no wrong been committed. Kramer, 152 Vt. at 55.

Hence, an award based on the appraised diminution in value in 1988 is not the proper method to determine plaintiff's damage. Cf. Smith v. Staso Milling Co., 18 F.2d 736, 739 (2d Cir. 1927) (L. Hand, J.) (noting that the value of country property in Vermont is "what it will fetch.").

Were this not the proper conclusion, any pre-1997 property holder, who had sold without loss, before Bianchi was handed down, could sue and recover losses that never occurred. An appraiser would render a "Bianchi valuation," at time of purchase, despite the fact that both purchase and sale occurred without regard to municipal permit problems.

Within this context, it is more proper to look at the moment of the plaintiff's actual injury in 1999. Bean v. Sears Roebuck, 129 Vt. 278, 282 (1971). Prior to that point, plaintiff had enjoyed the full benefit of his house for its indended purpose of residency as well as collateral functions such as securing loans. While plaintiff never attempted it, there is no reason to believe that the pre-Bianchi market would have stymied any attempts to sell the home. Only when plaintiff was unable to complete his sale because of the missing certificate did he suffered a cognizable harm. While the defect may have existed throughout his ownership, his only true injury and source of damages occurred in 1999. Following collapse of his sale, plaintiff had several options. One was to cure the certificate defect. Another was to minimize his exposure. Plaintiff was under no compulsion to do either, but he chose the latter. By arranging an exchange with the mortgagee, plaintiff in essence sold his house for $134,613.59. At the time of injury, but for the certificate of occupancy, plaintiff's house was worth $179,000. See Bean, 128 Vt. at 283–84 (affirming fair value to be what a willing buyer would pay a similarly disposed seller). Thus the difference in value is $44,386.41. Bean, 128 Vt. at 282. This is a more appropriate basis to measure plaintiff's actual loss both because it reflects plaintiff's actual

monetary shortfall and it assesses the damages at the point of injury. In light of <u>Kramer</u>, however, we would make an additional adjustment to this figure to include the real estate agent's commission that plaintiff would have incurred had the sale completed. <u>Kramer</u>, 152 Vt. at 56. From the plaintiff's own admission, this would be $10,500. Subtracting it out of the damages above would give a final valuation for plaintiff's damages at $33,886.41. While plaintiffs and defendants may assert evidence to adjust these numbers, this method will produce the only fair valuation of plaintiffs damages that avoids unjust enrichment while putting him at a position he would have occupied had defendant not committed a breach of duty. <u>Kramer</u>, 152 Vt. at 56 (discussing the flexible approach to damages in fraud and negligent misrepresentation cases).

Plaintiff next argues that prejudgment interest should apply to the earliest date possible, 1988. <u>Fleming</u>, 168 Vt. at 501. As our previous discussion notes, plaintiff's injuries were not reasonably ascertainable prior to 1999 when the <u>Bianchi</u> decision coupled with defendant's breach to frustrate plaintiff's purchase and sale. While the violation of plaintiff's rights may have technically occurred when he was not informed about the missing certificate, his injury and damages do not occur until later during the purchase and sale agreement. Therefore, it would make no sense to charge pre-judgment interest for a period when the damage was not reasonably ascertainable. <u>Turcotte v. Estate of LaRose</u>, 153 Vt. 196, 199 (1989) (pre-judgment interest is mandatory only "where the damages are liquidated or reasonably ascertainable as of the date of the tort"); Restatement (Second) of Torts § 913(1) (plaintiff entitled to interest from the time adopted for valuation); see, e.g., <u>Maxey v. Texas Commerce Bank of Lubbock</u>, 571 S.W.2d 39, 50–51 (Tex. Civ. App. 1978) (applying pre-judgment interest at the date of injury rather than date of lawyer's drafting). For the same reasons that we listed above, we cannot apply the mandatory

pre-judgment interest from <u>Turcotte</u>. The damages simply were not certain or ascertainable during plaintiff's tenure in the house. Only after May 1999 were plaintiff's expectations frustrated. Only then did he lose the profit from the expected sale. Nothing in the damages compensates plaintiff for this loss of time to invest and enjoy the 1999 profits. It is only just, then to compensate him for the lost opportunity to invest. While pre-judgment interest in this case is not mandatory, it is discretionary based on the award of damages and circumstances of the parties. See <u>Winey v. William E. Daley, Inc.</u>, 161 Vt. 129, 141 (1993) (weighing equitable considerations to decide pre-judgment interest where damages not readily ascertainable). We conclude that plaintiff is eligible for pre-judgment interest beginning May 1999.

Plaintiff's two remaining claims deal with consequential damages from the collapse of his purchase and sale agreement. As a general rule, attorneys are not liable for speculative damages. <u>Fritzeen v. Gravel</u>, 2003 VT 54, ¶ 12. Plaintiff's first claim for damages comes from an opportunity in 1998 to purchase with his then-fiancée a house in Massachusetts. Plaintiff claims because he was not able to sell his house in a timely manner, he was unable to free the money to invest. In the meantime, the house, which the fiancee purchased alone, has doubled in value. The problem with plaintiff's evidence is that there is no connection to the missing certificate. In 1998, plaintiff simply failed to attract any buyers for his house. There is no proof, thus far, that if the May 1999 deal had gone through, that he still would have had the investment option or that this failure led proximately to his failure to participate. Plaintiff's agreement to purchase the Massachusetts house was an oral arrangement with his fiancee, with whom he has since broken up. He had no binding commitment to the real estate and signed no written documents that would confirm this opportunity as anything more than speculative. Lost

opportunity claims cannot be based on speculation.  Bourne v. Lajoie, 149 Vt. 45, 53 (1987).  At this point this arrangement appears to have too many "what ifs" to establish a clear chain of causation to the failure of the certificate.

Plaintiff's final contention is for the alleged damage his credit has suffered as a result of returning his deed to the bank in exchange for the release of the mortgage.  Plaintiff's proof on this claim, however, is weak.  Plaintiff has not applied for another mortgage, and has not been denied a loan.  His sole proof is his claim that he was turned down for a credit card.  While this appears to be hearsay evidence, it does not in and of itself provide any link for causation since it did not state the reasons he was declined.  At best, plaintiff's claim appears to be for future injuries that might occur when he goes for another mortgage.  These are not compensable under Vermont law.  Hedges v. Durrance, 2003 Vt. 63, ¶ 12.  Damage to credit is subject to proof.  See Adamson v. Dodge, 174 Vt. 311, 323–25 (2002) (discussing proof of harm from credit ratings).  Court will not assume on basis of bald statement and then fabricate some value.

Since defendant has not moved for summary judgment on these two issues of consequential damage, plaintiff has not been required to make a sufficient showing of these damages.  Gallipo v. City of Rutland, 163 Vt. 83, 86 (1994).  It would be improper, at this time, to dismiss these claims without further opportunity to bring forth any and all additional evidence.  Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972).  As the discussion above illustrates, plaintiff's current evidence even if accepted as true, is not enough to establish these consequential damages.

Therefore, plaintiff Nelson's actual damages appear to be $33,886.41 with prejudgment interest calculated at 1% from May 1999.  The clerk shall set this matter for further conference.

Dated at Burlington, Vermont_____, 2004.


_____
Judge